**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

CANADA GEESE PROTECTION COLORADO, LLC and

FRIENDS OF ANIMALS,

      Plaintiffs,

v.

MARTIN LOWNEY, in his official capacity as Colorado State Director for the United States
Department of Agriculture, Animal and Plant Health Inspection Service, Wildlife Services;

ANIMAL AND PLANT HEALTH INSPECTION SERVICE, WILDLIFE SERVICES, an agency of
the United State Department of Agriculture; and

UNITED STATES FISH AND WILDLIFE SERVICE, an agency of the United States Department
of the Interior,

      Defendants.

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

**INTRODUCTION**

    1.    Plaintiffs, Canada Geese Protection Colorado, LLC (CGPC) and Friends of

Animals (FoA) file this action on its own behalf and on behalf of adversely affected

members to challenge the collective actions of United States Department of Agriculture

(USDA), Animal and Plant Health Inspection Service (APHIS), Wildlife Services, the U.S. Fish

and Wildlife Service (FWS), and Denver Parks and Recreation (DPR) authorizing the lethal

take of 4,000 Canada geese in 2020, a majority of which will be killed within the City and

County of Denver.

2.      Despite the complete lack of accurate and updated Canada geese population numbers in Colorado, these agencies seek to roundup, remove, and slaughter thousands of Canada geese beginning as early as July 1, 2020. Overall, the agencies are authorized to lethally take up to 10% of Colorado's Canada geese population.

3.      Factually, there is no reason to take lethal action against the Canada geese. They do not pose any direct threat to property or public health. Instead, this action is being taken as a cheap and easy way to reduce the amount of geese feces within parks. But there are plenty of nonlethal, less invasive, and less expensive ways to achieve this result, including hazing geese out of certain areas, habitat modification, and increasing efforts to collect feces (manually or through use of mechanical devices).

4.      Overall, the plan is legally flawed.

5.      First, the Environmental Assessment (EA), prepared to support the plan under the National Environmental Policy Act (NEPA), fails to take a hard look at the impacts of removing the geese. Indeed, just last year, Wildlife Services Colorado conducted Denver's largest ever lethal removal of Canada geese – rounding up and sending to slaughter 1,662 Canada geese taken from four Denver parks. However, rather than analyzing how the 2019 and 2020 roundups might cumulatively impact Colorado's Canada geese population, the EA simply says that any information concerning the 2019 roundup is outside the timeframe of analysis.

6.      Equally important, the EA fails to rely on updated and scientifically supported data on Canada geese populations in Colorado, including updated population numbers and current conditions in Denver parks and other areas of Colorado where lethal take of Canada geese may take place. Instead it relies solely on data and population estimates from 2013 to 2017 to inform its analyses – estimates that Colorado Parks and Wildlife (CPW) has repeatedly labeled unreliable. As such, the analysis in the EA is based on incomplete and uninformed information.

7.      The EA also badly fails to fully analyze the risks associated with donating Canada geese rounded up and removed from Denver parks treated with dangerous biocides to needy families in Colorado. Studies examining the effects of exposure to contaminants among human populations remain controversial due to inconsistent findings among studies, and therefore uncertainty exists concerning the safety of donating wild Canada goose meat.

8.      Finally, FWS's decision to issue a depredation permit under the Migratory Bird Treaty Act (MBTA) authorizing the lethal take of 4,000 Canada geese was done without any reasonable evidence that the take is necessary and in accordance with the MBTA. Based on Wildlife Services own numbers, a significant percentage of Denver's Canada geese population could be lethally taken in 2020 – far more than 10% of the Denver Canada goose population. FWS did not take this into consideration in issuing the permit. FWS also failed to consider evidence that lethal take may not be necessary because there are far fewer geese in Denver parks in 2020, likely due to new regulations allowing nest and egg destruction all year round. Moreover, a depredation permit is not lawful under the MBTA in situations in which migratory birds are merely causing a nuisance. Again, however, the agencies acknowledge that the only reason for rounding up and slaughtering geese is because of the feces.

9.      Accordingly, Plaintiffs challenge the following: (1) the January 16, 2020 Decision and Finding of No Significant Impact for Bird Damage Management in Colorado Environmental Assessment prepared by USDA APHIS Wildlife Services, specifically as the decision applies to Canada geese (collectively, "2020 Decision"), and (2) the April 9, 2020 Depredation Permit issued by FWS authorizing the lethal take of 4,000 Canada geese in 2020, Permit Number MB71232D-0 ("2020 Goose Kill Permit").

10.     This is a civil action for declaratory and injunctive relief, arising under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, and alleging violations of NEPA, 42 U.S.C. §§ 4321-4347, and the MBTA, 16 U.S.C. §§ 703–712.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. §§ 701-706 (APA). This action presents a case and controversy arising under NEPA and the MBTA, federal statutes. This Court also has jurisdiction pursuant to 28 U.S.C. § 1346, as the United States is a defendant.

12.     This Court has the authority to grant Plaintiffs requested relief pursuant to 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief) and 5 U.S.C. §§ 701-706 (APA).

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e), as a substantial part of the events or omissions giving rise to Plaintiffs claims occurred in this district.

## PARTIES

14.     Plaintiff, CGPC, is a grassroots activist group founded by Denver residents on July 7, 2019, after 1,662 geese were exterminated in Denver parks without any public notice. CGPC is dedicated to protecting Colorado's Canada geese, birds of prey, and other avian species from being killed to control their population, and support humane, nonlethal methods. CGPC was incorporated as a Limited Liability Corporation in Colorado in 2020.

15.     Plaintiff, FoA, is a nonprofit international advocacy organization incorporated in the State of New York since 1957. FoA has nearly 200,000 members. FoA has offices in Darien, Connecticut and Centennial, Colorado. FoA's Wildlife Law Program, the office filing this Complaint, was established in 2013 and is located at 7500 E. Arapahoe Road, Suite 385, Centennial, Colorado. FoA seeks to free animals from cruelty and exploitation around the world, and to promote a respectful view of non-human, free-living, and domestic animals. FoA engages in a variety of advocacy programs in support of these

goals. FoA informs its members about animal advocacy issues, and the organization's progress in addressing these issues, through its magazine, *Action Line*, its website, social media, and other reports. FoA has published articles and information advocating for the protection of wildlife species, including Canada geese.

16.    Defendant, MARTIN LOWNEY, is the State Director of Wildlife Services Colorado. He is the authorized representative who is responsible for collaboratively administering the activities conducted in the Cooperative Service Agreement, Work Plan, and Financial Plan for management of the Canada geese population in Colorado.

17.    Defendant, ANIMAL AND PLANT HEALTH INSPECTION SERVICE, WILDLIFE SERVICES, is a federal agency within the United States Department of Agriculture and is responsible for agency actions challenged herein.

18.    Defendant, UNITED STATES FISH AND WILDLIFE SERVICE, is a federal agency within the United States Department of the Interior and has statutory authority and responsibility for enforcing the MBTA and issuing permits for otherwise prohibited activities under the Act, including Federal Migratory Bird Depredation Permits.

## LEGAL BACKGROUND

### A.    National Environmental Policy Act.

19.    The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq*., is our nation's basic charter for environmental protection. 40 C.F.R. § 1500.1(a).

20.    Congress enacted NEPA for two central purposes. First, Congress sought to ensure that all federal agencies examine the environmental impacts of their actions before acting. Second, Congress sought to provide the public with a statutory means for being informed about, and commenting on, the environmental impacts of proposed agency actions. *Id*. § 1500.1.

21.    "The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect,

restore, and enhance the environment." *Id.* § 1500.1(c). The Council on Environmental Quality (CEQ) "regulations provide the direction to achieve this purpose." *Id.* To that end, "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.* § 1500.1(b).

22.     NEPA requires federal agencies to analyze the environmental impact of a particular federal action before proceeding with the action. 42 U.S.C. § 4332(2)(C). Before an agency can undertake a federal action that significantly affects the quality of the human environment, NEPA mandates that the acting agency prepare a detailed environmental impact statement (EIS) including "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] (iii) alternatives to the proposed action." *Id.* Where the significance of the potential impact is at first unknown, agencies may first prepare an environmental assessment (EA) to determine whether a proposed action requires preparation of an EIS or warrants a finding of no significant impact.

23.     Whether an EA or EIS, the environmental analysis must disclose and analyze the direct, indirect, and cumulative effects of the proposed action on the environment. *Id.* §§ 1502.16 (discussion of environmental consequences), 1508.7 (cumulative impacts), 1508.8 (direct and indirect effects), 1508.25(c)(3) (scope of impacts that must be considered).

24.     An agency has a continuing obligation to comply with NEPA and must prepare a supplemental NEPA document when "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" emerge. *Id.* § 1502.9(c)(1)(ii).

**B.** **The Migratory Bird Treaty Act.**

25.     The Migratory Bird Treaty Act (MBTA), 16 U.S.C. §§ 703-712, was signed into law in 1918 and is among the oldest wildlife protection laws in the United States.

26.     The MBTA implements Conventions between the United States and four countries – Canada, Mexico, Japan, and Russia – for the protection of migratory birds.

27.     The MBTA makes it unlawful to take any migratory bird covered by the Act "except as permitted by regulations made as" provided by the Act. *Id*. § 703(a).

28.     The MBTA provides that "it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof, included in the terms of the conventions between the United States and Great Britain for the protection of migratory birds . . . the United States and the United Mexican States for the protection of migratory birds and game mammals . . . the United States and the Government of Japan for the protection of migratory birds and birds in danger of extinction, and their environment . . . and the convention between the United States and the Union of Soviet Socialist Republics for the conservation of migratory birds and their environments[.]" *Id.*

29.     The Secretary of the Interior "is authorized and directed . . . to determine when . . . it is compatible with the terms of the conventions to allow hunting, taking, capture, killing, possession, sale, purchase, shipment, transportation, carriage, or export of any such bird, or any part, nest, or egg thereof, and to adopt suitable regulations permitting and governing the same." *Id.* § 704(a).

30.     Migratory bird species protected by the MBTA are specifically listed in the regulations. This list includes the Canada goose (*Branta canadensis*). *See* 50 C.F.R. § 10.13(c).

31.     The regulations provide for various forms of permits and licenses to kill migratory birds. *See* 16 U.S.C. 704; 50 C.F.R. Part 20 (migratory bird hunting regulations); Part 21 (Migratory Bird Permits).

32.     "[A] depredation permit is required before any person may take, possess, or transport migratory birds for depredation control purposes." *Id*. § 21.41(a).

33.     FWS's authority to issue depredation permits under § 21.41 is limited in certain respects by subsections (c) and (d) of that provision. Subsection (d) provides, for instance, that a permit's duration is limited to one year. Subsection (c) sets forth conditions common to all permits, such as the prohibition of certain hunting practices and mandatory steps for disposing of birds that have been killed; it also states that depredation permits are subject to the general conditions set forth in 50 C.F.R. Part 13. Other provisions further limit and guide the agency's permitting authority.

34.     A depredation permit is intended to provide short-term relief for bird damage until long-term nonlethal measures can be implemented to eliminate or significantly reduce the problem.

35.     Federal depredation permit applications consist of the following two forms: (1) the FWS application Form 3-200-13, including Section E questions 1 to 13, and (2) the "Form 37 Permit Review Form."

36.     According to the application form, "[y]ou should apply for a depredation permit only after deterrents such as hazing and habitat modification prove unsuccessful."

37.     According to the application form, if a permit is issued, the permittee is "expected to continue nonlethal methods in conjunction with" any authorized lethal methods.

38.     Depredation permit applications must include, among other general information, (1) a description of the area where depredations are occurring; (2) the nature of the crops or other interests being injured; (3) the extent of such injury; and (4) the particular species of migratory birds committing the injury. *Id.* § 21.41(b).

39.     Section E of the permit application includes requirements to attach specific documents, including a recommendation from USDA APHIS Wildlife Services that a permit be issued. If Wildlife Services recommends that a permit be issued to capture or kill birds, Wildlife Services will complete an evaluation form (Form 37) that must be submitted with the permit application. Additional attachments to Section E include copies of receipts, invoices, contracts, or other available records documenting deterrent measures, a Take Request Table listing the species that will be taken pursuant to the permit, the specific locations where the species will be taken, and other supporting information, including photographs of damages.

40.     Section E of the permit application also includes a questionnaire asking for specific details concerning alleged damages, risks, methods of take, nonlethal deterrents, and other justifications that must be filled out and submitted with the application.

41.     As a condition of the permit, permittees are required to submit an annual report (Form 3-202-9) certifying when and where migratory birds, including active nests, are taken, the quantity taken, and the final disposition of birds, eggs, and/or carcasses taken pursuant to the depredation permit.

42.     According to the regulations, permittees may not kill migratory birds unless specifically authorized to do so on the permit. *Id.* § 21.41(c)(1).

43.     According to the regulations, "[a]ll migratory birds killed shall be retrieved by the permittee and turned over to a Bureau representative or his designee for disposition to charitable or other worthy institutions for use as food, or otherwise disposed of as provided by law." *Id.* § 21.41(c)(4).

44.     According to the regulations, "[o]nly persons named on the permit are authorized to act as agents of the permittee under authority of the permit." *Id.* § 21.41(c)(5).

45.     According to the regulations, "[t]he tenure of depredation permits shall be limited to the dates which appear on its face, but in no case shall be longer than one year." *Id.* § 21.41(d).

46.     FWS has statutory authority and responsibility for enforcing the MBTA and issues permits for otherwise prohibited activities under the Act, including Federal migratory bird depredation permits. *See* 50 C.F.R. § 21.41.

47.     In 2006, FWS issued a Depredation Order for resident Canada geese nests and eggs. *See* 50 C.F.R. § 21.50. This Order is also known as the public health control order for resident Canada geese.

48.     The Depredation Order authorizes landowners and local governments who register with FWS (no permit required) to destroy resident Canada geese nests and eggs "at any time of year." *Id.* § 21.50(d)(4).[1]

49.     Registrants exercising the egg and nest destruction activities must submit an annual report summarizing activities, including the date, numbers, and location of nests and eggs taken by October 31st of each year. *Id.* § 21.50(d)(6).

50.     The public health control order for resident Canada geese authorizes States, Tribes, and the District of Columbia, via the State or Tribal wildlife agency, to conduct resident Canada geese control and management activities, including direct control strategies such as trapping and relocation, nest and egg destruction, gosling and adult trapping and culling programs, or other lethal and nonlethal wildlife damage management

---

[1] Until July 21, 2019, regulations only allowed registrants to conduct egg and nest destruction activities between March 1st and June 30th.  New regulations allow egg and nest destruction activities at any time of the year.

strategies, "when resident Canada geese are posing a direct threat to human health." *Id.* §
21.52(b).

51.     Resident Canada geese are considered a "direct threat to human health"
when the geese "pose a specific, immediate human health threat by creating conditions
conducive to the transmission of human or zoonotic pathogens. A State or Tribe may not
use this control order for situations in which resident Canada geese are merely causing a
nuisance." *Id.* § 21.52(c).

52.     A separate depredation order addresses resident Canada geese management
at agricultural facilities. *Id.* § 21.51.

## FACTUAL BACKGROUND

**A.     Canada geese.**

53.     Canada geese (*Branta canadensis*) are federally protected under the MBTA.
16 U.S.C. §§ 703-712; *see also* 50 C.F.R. § 10.13 (list of migratory birds).

54.     Canada geese are one of the most readily recognized birds in the United
States and are easily identifiable with their dark black heads and white chinstraps. Canada
geese can reach up to 20 to 25 pounds in size and live approximately 10 to 25 years in the
wild. The males (ganders) and the females (geese) are similar in appearance, and the
goslings are yellow.

55.     Two types of Canada geese populations exist in most parts of the United
States – resident (or nesting) Canada geese and wintering (or migratory) Canada geese.
Resident Canada geese were recently redefined as "Canada geese that nest within the lower
48 States and the District of Columbia or that reside within the lower 48 States and the
District of Columbia in the months of April, May, June, July, or August." 50 C.F.R. § 21.3.[2]

---

[2] Until July 21, 2019, regulations defined resident geese as "Canada geese that nest within
the lower 48 States and the District of Columbia in the months of March, April, May, or June,
or reside within the lower 48 States and the District of Columbia in the months of April,
May, June, July, or August."

According to an APHIS Wildlife Service informational document titled *Management of Canada Goose Nesting*, "Migratory Canada geese move between breeding grounds in Canada and overwintering areas in the US, but do not nest in the lower 48 states."

56.     All Canada geese, including both resident and wintering Canada geese, are protected under the MBTA. *See* 50 C.F.R. § 10.13.

57.     Canada geese mate for life and will stay together even outside of the nesting season. Canada geese have one nest per year. Nesting spots are chosen on an elevated open area with good visibility and generally near water. Nesting occurs from mid-March through mid-May, with the geese laying one egg every other day, and an average clutch size of five to seven eggs. The eggs are incubated for 28 to 30 days and the goslings typically hatch on the same day. The young cannot fly until they are two to three months old and are watched over, and can be vigorously defended, by both parents.

58.     As the nesting season passes, Canada geese gather into flocks and congregate in open areas for the molting period. During the molt, resident geese lose their flight feathers and remain flightless during mid-June to early July. Molting geese generally prefer areas that provide food (grass or crops) and water. During this time, the goslings are also flightless since they have not yet developed their adult feathers that will enable them to fly. After adults have completed the molt, and young geese grow their first flight feathers, they begin to travel in flocks.

59.     Canada geese are primarily herbivores, eating a variety of grasses and aquatic vegetation, although some insects, small fish, or mollusks may be consumed. Grains can be a major food source during winter and migration when less green grass is available.

60.     Traditional parks with large expanses of Kentucky blue grass lawns and open access to shallow lakes are ideal and preferred Canada geese habitat. Canada geese like to feed on the grass and have open views in all directions to watch for predators with easy access to water to escape from potential danger.

61.     Loss of habitat and overhunting in the 1800s and early 1900s almost led to the extinction of Canada geese. However, a small flock was rediscovered in 1962 in Minnesota, and following successful efforts to both protect and reintroduce the species, the Canada goose population is now stable.

62.     Today, the primary method used to manage Canada geese populations in North America remains recreational hunting. Increasingly, direct killing by federal and state agencies is also occurring to address what government perceives to be unwanted impacts to parks and other recreational areas from Canada geese populations.

**B.      Canada Geese in Colorado.**

63.     Canada geese are found throughout Colorado, including in Denver and the Front Range.

64.     According to Colorado Parks and Wildlife's (CPW) *Colorado Resident Canada Goose Management Plan* ("CPW Plan"), issued in April 2019, it is not possible to distinguish between resident and wintering geese.

65.     During migration and winter, different breeding populations of geese often mix together. Large numbers of Canada geese that breed outside of Colorado migrate through and winter in Colorado. While many geese that breed in Colorado also winter in Colorado, often moving short distances or to lower elevations during colder months, some resident breeding Canada geese in Colorado migrate out of the state during winter.

66.     Resident Canada geese do not simply stay in one place, such as a park, for years on end. Although geese may return to a park to nest, they never stay in the same place year-round, and will likely move to another area if the habitat is not conducive to their needs and/or when their goslings are able to fly.

67.     During migration (late fall through early spring) there is an increase in Canada geese populations throughout Colorado as large migratory flocks stop in parks in route to and from their winter and summer habitats.

68.     Current federal regulation frameworks permit CPW to provide 107-day hunting seasons (the maximum allowed under the MBTA), with daily limits of four in the Pacific Flyway and five in the Central Flyway portions of Colorado. From 1999 to 2017, an average of 14,044 hunters in Colorado spent an average of 5.86 days per hunter hunting geese, and the average seasonal harvest was 6.6 geese per hunter.

69.     Along the Front Range, Denver Parks and Recreation (DPR) manages Canada geese populations within 11 public parks in Denver. This management includes egg oiling, a process by which eggs are coated with corn oil in order to reduce the hatch success rate of goose eggs, hazing, and some habitat modification.

70.     Guns cannot legally be used for Canada goose management in Denver parks.

**C.     Previous Federal Involvement in Canada Geese Management in Colorado (Pre-2020).**

71.     Between 2013 and 2017, Wildlife Services Colorado lethally removed, on average, 314 birds and 5 nests per year throughout Colorado.

72.     On October 22, 2018, the City and County of Denver and Wildlife Services Colorado entered into a Cooperative Service Agreement, including a Work Plan (Attachment A) and Financial Plan (Attachment B), for the performance of certain services concerning Canada geese management. *See* Agreement No. 18-7308-6942-RA.

73.     The Cooperative Service Agreement became effective on January 1, 2019 and continued through December 30, 2019.

74.     The Cooperative Service Agreement provides that it may be amended or extended at any time by mutual agreement of the parties in writing. According to the Cooperative Service Agreement, the City and County of Denver must submit a written request to extend at least 30 days prior to expiration of the Agreement.

75.     The purpose of the Cooperative Service Agreement "is to facilitate [a] cooperative management program for the City and County of Denver though its

14

Department of Parks and Recreation, which wishes to retain the professional services of [Wildlife Services Colorado] for technical, research, and operational assistance for Wildlife Damage Management ("WDM") Program, specifically Canada Geese."

76.     The Work Plan (Attachment A) discusses strategies specific to the Metropolitan Denver area with the primary objective of responsibly managing both resident (nesting) and migratory (wintering) Canada goose populations and thereby reducing associated bird damage complaints from the community.

77.     The Financial Plan (Attachment B) provides estimated costs for the activities conducted by Wildlife Services Colorado pursuant to the Agreement. Such costs include, but are not limited to, salary/benefits, vehicle use, supplies/equipment and administrative costs. According to the Financial Plan, estimated costs for Denver Parks and Recreation from January 1, 2019 through December 31, 2019 totaled $149,722.43.

78.     Through the Cooperative Service Agreement, Wildlife Services Colorado agreed to provide wildlife management measures to manage Canada geese damage to property, human health and safety threats, and any associated maintenance problems as well as other wildlife damage on property managed by the City and County of Denver.

79.     The agreement is contingent upon compliance with NEPA, the Endangered Species Act, and any other applicable federal statutes.

80.     The Cooperative Service Agreement requires Wildlife Services Colorado to obtain a federal depredation permit from FWS.

81.     Wildlife Services Colorado further recommends implementing best practice integrated management approaches aimed at reducing property damage caused by Canada geese to all city-owned public parks, ballfields, and other man-made and natural habitats.

82.     The integrated management approach includes federal technical assistance, communication, and outreach to gain public support for management decisions, and more specifically, resident Canada geese population management.

83.     Resident Canada geese population management includes capturing geese during the annual molt (a four to five-week flightless period in mid-June through mid-July) by herding the geese into capture pens and transporting the live geese to a slaughterhouse where the meat is then packaged and donated to undisclosed organizations for donation to the poor for human consumption.

84.     Other methods may also be utilized to capture geese and reduce their abundance to increase opportunities to use park lands for intended purposes.

85.     On June 5, 2019, FWS issued a depredation permit to Wildlife Services Colorado pursuant to 50 C.F.R. § 21.41 authorizing the lethal take of multiple bird species, including 2,200 Canada geese, ten Canada geese nests, and 500 Canada geese eggs. *See* Permit Number MB715492-1 ("2019 Permit").

86.     The 2019 Permit became effective on June 5, 2019 and expired on December 31, 2019.

87.     In March 2019, Wildlife Services Colorado conducted site visits to ten public parks within Denver. Wildlife Services Colorado conducted egg oiling at Berkeley, Rocky Mountain, Barnum Park, Overland Pond, and Sloan's Lake Parks. Nests and eggs were only found on the center island of Sloan's Lake by USDA and 623 eggs were treated. DPR staff also treated 2,468 eggs during this time at Washington, City, Garfield, and Harvey Parks.

88.     In April 2019, Wildlife Services Colorado requested a variance (request RF19-53) from the Colorado Retail Food Establishment Rules and Regulations (6 CCR 1010-2) section to allow wild Canada geese killed as part of lethal management efforts in Denver's Parks to be processed and donated to local charitable organizations for human consumption. Wildlife Services Colorado requested this variance in order to use the wild geese meat as food for charitable donations by the Colorado Department of Public Health and Environment (CDPHE).

89.     A variance "authorizes a modification or waiver of one or more requirements of th[e] Code if, in the opinion of the regulatory authority, a health hazard or nuisance will not result from the modification or waiver." *See* Colorado Retail Food Establishment Rules and Regulations, § 8-103.10.

90.     Statewide variance request RF19-53 was approved by CDPHE and issued to CPW on June 4, 2019.

91.     During the months of June through July 2019, Wildlife Services Colorado used "drive-traps" to capture Canada geese during the molt (i.e., when they are flightless).

92.     In June and July 2019, Canada geese were rounded up from four of Denver's parks – Washington Park, City Park, Sloan's Lake, and Garfield Lake Park. A total of 1,662 geese were removed from the four Denver parks – 576 from Washington Park, 703 from City Park, 235 from Sloan's Lake, and 148 from Garfield Lake Park. According to USDA, the geese were transported to an undisclosed processing plant to be slaughtered and then distributed to anonymous organizations.

93.     Approximately 1,521 pounds of Canada geese meat was donated. The name of the slaughterhouse used to process the geese was not disclosed to the public.

94.     One organization, Metro Caring in Denver, purportedly received 268 pounds of the 1,521 pounds collected. The recipients of the remaining Canada geese meat and other geese parts, if any, were not disclosed to the public. It is unclear what became of the remaining geese that were rounded up and killed.

95.     FoA sued Wildlife Services and FWS in the U.S. District Court for the District of Colorado for implementation of Canada Geese management in and around Denver in 2019. The suit alleged that the agencies failed to comply with NEPA. Pursuant to a settlement, the federal defendants agreed to prepare additional NEPA documentation before conducting any further removal of Canada geese in Denver.

**D.      Current Federal Involvement in Canada Geese Management in Colorado.**

**1.      The 2020 Environmental Assessment.**

96.      In September 2019, Wildlife Services Colorado issued a draft Environmental Assessment (EA) for Bird Damage Management in Colorado.

97.      The draft EA identified four alternatives for managing alleged damage associated with numerous bird species, including Canada geese, on public, private and tribal lands in Colorado.

98.      Although the draft EA claims to provide a detailed analysis of the impacts of each alternative, the draft EA acknowledges that Wildlife Services Colorado "will likely continue the current implementation of an adaptive integrated approach utilizing both non-lethal and lethal techniques, in accordance with the [Wildlife Services] Decision Model[.]"

99.      Notably, the draft EA did not reference or include any data or analysis concerning the largest Canada geese roundup ever conducted in Colorado history. Specifically, the draft EA did not address the 2019 activities where Wildlife Services Colorado rounded up and removed 1,662 Canada geese from Denver Parks.

100.      Plaintiffs submitted comments on the draft EA on October 25, 2019.

101.      Plaintiffs' comments focused primarily on Canada geese management in Colorado, and more specifically, any future requests for Wildlife Services Colorado to conduct roundups or culling activities to reduce Canada geese populations in Denver parks.

102.      Plaintiffs' commented that the draft EA failed to include any data or analysis concerning the roundup and "cull" of 1,662 Canada geese from four Denver parks as well as any data concerning roundups and/or "culls" throughout Colorado in 2019.

103.      Plaintiffs' commented that the draft EA did not explain discrepancies in Canada geese population numbers and fails to explain why it ignored evidence that the population may be declining.

104.    Plaintiffs' commented that the proposed action would not meet the purpose and need for bird damage management activities concerning Canada geese in Denver's parks because lethally removing Canada geese from Denver parks will not resolve any purported geese related issues in Denver parks.

105.    On December 12, 2019, the City and County of Denver and USDA APHIS Wildlife Services entered into a First Amendment to the Cooperative Service Agreement and a Financial Plan (Attachment B-1).

106.    Under the amended Agreement, the City and County of Denver will continue to utilize the professional services of Wildlife Services Colorado for technical, research, and operational assistance . . . as set forth in the Agreement."

107.     The amended Agreement became effective January 1, 2019 and shall continue through December 30, 2020. The estimated costs for DPR from January 1, 2020 through December 31, 2020 total $108,000.

108.    In January 2020, USDA Wildlife Services issued a final Environmental Assessment (EA) ("2020 EA") and Decision and Finding of No Significant Impact for the EA ("2020 Decision Record and FONSI") for Bird Damage Management in Colorado.

109.    According to the 2020 Decision Record and FONSI, the purpose of the proposed action is to reduce human-wildlife conflicts in Colorado by managing damage and threats of damage to human health and safety, property, agricultural resources, and natural resources associated with bird species, including Canada geese.

110.    According to the 2020 Decision Record and FONSI, the analysis in the 2020 EA indicates that Alternative 1, the Proposed Action, "does not constitute a major federal action significantly affecting, individually or cumulatively, the quality of the human environment" and therefore an EIS was not prepared.

111.    According to the Decision Record and FONSI, Wildlife Services Colorado is not required to include data from the 2019 roundup and removal of Canada geese from four Denver parks because it occurred outside of the years covered in the analysis.

112.    In response to Plaintiffs' comments, the 2020 EA provided the number of geese rounded up from four Denver parks, but did not include any analysis of the impacts of the roundup or the potential cumulative impacts of the roundup with past, present, and reasonably foreseeable future actions on the Canada geese population in Denver and throughout Colorado.

113.    Apart from revisions to the dates, the First Amendment to the Cooperative Service Agreement and the amended Work Plan did not revise any elements of the Plan in any way, despite the issuance of the 2020 EA.

**2.    Denver Parks and Recreation's 2020 Resident Canada Goose Damage Management Program.**

114.    On April 3, 2020, DPR issued the Resident Canada Goose Damage Management Program (hereinafter, "2020 Program"). To the best of FoA's knowledge, the 2020 Program replaces a similar Program issued in June 2019, titled Goose Management Program.

115.    The 2020 Program defines DPR's goals, objectives and strategies for managing resident Canada geese populations on Denver park properties.

116.    The 2020 Program provides guidance and procedures for how DPR, CPW, FWS, and Wildlife Services ensure consistency and efficacy in best management practices for resident Canada geese populations in Denver park properties.

117.    According to DPR, growing human populations coupled with growing resident Canada geese populations have led to increased conflicts with human activities and concerns related to human health and safety, along with park degradation. DPS further states that the most prevalent effects of too many resident geese are unmanageable

accumulations of feces in areas in which park users recreate, along with damage to park property.

118.    The objectives for implementing the 2020 Program include addressing "the unhealthy imbalance of resident Canada geese populations and available habitat; minimizing human/geese conflicts; and reducing resident geese populations in a socially and biologically acceptable, site-specific, and effective manner.

119.    The primary nonlethal methods used include egg oiling, hazing, exclusions, and habitat modifications, including sweepers and "other machines" to keep sidewalks, trails, and parks clear of geese feces. The 2020 Program notes that research of "other equipment" and "new technology and associated costs is ongoing."

120.    The 2020 Program does not state that it uses or intends to use cost-effective park cleaning machines, such as tow-and-collect machines and front-load cleaning attachments used on commercial lawn mowers, despite the successful deployment of these machines to clean up goose feces in other Colorado parks, including in Boulder, Colorado.

121.    According to the 2020 Program, "[w]hen all other management methods for moderating resident Canada goose populations do not meet the objectives of the damage management program," removal through capture and euthanasia may be a viable alternative.

122.    According to the 2020 Program, lethal methods for managing Canada geese populations at specific park locations may be employed, including nest/egg destruction, live capture and transportation to processing facilities, live capture and euthanasia, and dispatching (shooting). However, shooting is not an option within the City and County of Denver.

123.    According to the 2020 Program, "[l]ethal methods are allowed year-round with a permit from" from FWS.

124.    According to the 2020 Program, "DPR has a 3-year Cooperative Service Agreement (2019-2021) with [Wildlife Services Colorado] that allows the federal agency to assist DPR in goose management efforts to reduce the resident Canada goose population in Denver parks and golf courses."

125.    However, the Cooperative Service Agreement is only effective for one year and must be amended or extended every year.

126.     According to the 2020 Program, when all other management methods for moderating resident Canada geese populations do not meet the objectives of the damage management program, removal through capture and euthanasia may be a viable alternative.

### 3.      2020 Federal Migratory Bird Depredation Permit.

127.    On April 9, 2020, FWS issued a depredation permit to Wildlife Services Colorado pursuant to 50 C.F.R. § 21.41 authorizing the lethal take of Canada geese in Colorado in 2020. *See* Permit Number MB71232D-0.

128.    The 2020 Goose Kill Permit became effective on April 9, 2020 and expires on December 31, 2020.

129.    The 2020 Goose Kill Permit authorizes Wildlife Services Colorado to lethally take at least 4,000 resident Canada geese in Colorado in 2020.

130.    The 2020 Goose Kill Permit further states that "[i]f the problem hasn't been resolved by the above authorized activities, then a written request with justification to amend the permit must be submitted to the issuing office for additional authorization." Therefore, the permit could potentially authorize Wildlife Services Colorado to use lethal take for more than 4,000 Canada geese in Colorado in 2020.

131.    Wildlife Services Colorado's request for authorization to lethally take 4,000 resident Canada geese is based on a population estimate of 44,000 resident Canada geese

in Colorado, or approximately 9% of the estimated population of 44,000 resident Canada geese.

132.    The population estimate of 44,000 resident Canada geese is not based on any official population counts.

133.    The population estimate of 44,000 resident Canada geese is not included in the CPW Plan.

134.    Outside of the 2020 Goose Kill Permit, FWS also authorized at least 14 other Federal depredation permits pursuant to 50 C.F.R. § 21.41 for the lethal take of Canada geese in Colorado. The permits authorize the lethal take of approximately 940 additional Canada geese, primarily from Colorado airports.

135.    The 2020 Goose Kill Permit authorizes the following methods of lethal take of Canada geese in Colorado in 2020: (a) firearms; (b) nets; (c) registered animal drugs (excluding nicarbazin) and registered pesticides and repellents; and (d) legal lethal and live traps.

136.    According to the Goose Kill Permit, all take must be completed as part of an Integrated Wildlife Damage Management Program that emphasizes the use of appropriate nonlethal management techniques.

137.    Birds caught live using methods other than pole traps may be euthanized but could also be transported and relocated to another site approved by the appropriate State wildlife agency, if required.

138.    According to the Goose Kill Permit, all migratory birds killed shall be retrieved by the permittee and turned over to a Bureau representative or his designee for disposition to a charitable or other worthy institutions for use as food, or otherwise disposed of as provided by law.

139.     According to the Standard Conditions issued with the 2020 Goose Kill Permit, Wildlife Services Colorado is required to minimize the lethal take of Canada geese and continually apply nonlethal methods of harassment in conjunction with lethal control.

140.     According to the Standard Conditions issued with the 2020 Goose Kill Permit, migratory birds, nests, or eggs taken under this permit must be: (a) turned over to the USDA for official purpose, or (b) donated to a public education or scientific institution, or (c) completely destroyed by burial or incineration, or (d) with prior approval from the permit issuing office, donated to persons authorized by permit or regulation to possess them.

141.     Culling of Canada geese under the amended Agreement, the 2020 EA, and the April 9, 2020 permit may commence as early as July 2020.

**E.     Common Elements of the 2019 EA, 2020 Program, and the 2020 Depredation Permit.**

   **1.     Inadequate Data and Missing Information was Used in the Decisionmaking Processes by all Defendants.**

161.     There are no statewide surveys of rigorous breeding populations of Canada geese.

162.     Results from a banding program conducted between 2000 and 2006 by CPW provided a benchmark of approximately 17,400 to 26,100 resident Canada geese statewide, with much of the population residing along the Front Range.

163.     The CPW Plan cautioned that this is at best a crude index to the true population. The CPW Plan further stated that "[f]or future management decisions and communications purposes, it is useful to track indices for the overall population trend and distribution of resident Canada geese across Colorado."

164.     Citing only to a personal communication in 2017, DPR claims in the 2020 Program that recent resident Canada geese population surveys conducted by CPW

personnel have documented approximately 44,000 breeding pairs within the Front Range Metropolitan Area.

165.     Relying on DPR's estimates and a personal communication, the 2020 EA claims that the estimated number of "resident" Canada Geese in Colorado was approximately 17,100 to 26,000 geese in 2006 and 44,000 geese in 2018, and further claims, without citation, that the metropolitan Denver area has an estimated 10,153 geese.

161.     FWS relies on the estimated numbers provided by DPR and the 2020 EA in its authorization of the 2020 Goose Kill Permit for the lethal take of 4,000 Canada geese in Colorado in 2020.

162.     The 2020 EA states that the current annual growth rate for Canada geese populations in Denver parks is 41% per year despite intensive nest and egg destruction efforts.

163.     Without providing any additional references, surveys, methods, or population numbers, the 2020 Program asserts that this represents a 50% population increase over the prior two years, which can be attributed to an increase in suitable nesting habitat, immigration, and unregulated goose reproduction throughout the area.

164.     However, CPW has acknowledged that, even if there is an increase, which has not been confirmed, it is closer to a 7.21% average annual increase (0.17-15.19%) in the breeding population of Canada geese from 2005 through 2015.

165.     Neither DPR nor Wildlife Services Colorado explain how the Canada geese population went from an average 7% increase to a 50% increase in a matter of a few years.

166.     None of the relevant decisionmaking documents include any citations or additional information, including how the alleged surveys were conducted, when the surveys were conducted, who conducted the surveys, and the results of the individual surveys.

167.    The 2020 EA acknowledges that it is unknown how many resident Canada geese occur throughout Colorado due to a lack of rigorous breeding population surveys.

168.    FWS's Waterfowl Population Status in 2017 states that the Hi-Line Population (HLP) geese wintering in northeastern Colorado and metropolitan Denver has increased 6-fold over the past 30 years. However, the Waterfowl Population Status does not narrow any population numbers down to northeastern Colorado and metropolitan Denver and never makes any statements concerning a 6-fold increase in northeastern Colorado and metropolitan Denver over the past 30 years.

169.    The 2020 EA states that the results of the Waterfowl Breeding Population and Habitat Survey, which does not include Colorado, found a 7-fold increase in the HLP from the 1970s to the present, but fails to note that CPW found that there was no significant trend in these indices during 2009 to 2018. This suggests that, over the last nine years, it is likely that there has been no significant increase in HLP Canada geese.

170.    The 2020 Waterfowl Survey was cancelled due to the pandemic.

171.    The CPW Plan expressly states that there are no statewide, rigorous breeding population surveys of Canada geese conducted in Colorado.

172.    Other than fleeting references to a Simulated Population Management Tool for Canada Geese (SPRAG), the 2020 EA provides no references as to where population numbers came from, how the population numbers were derived, when the data was collected, and whether recent management actions, specifically the 2019 removal and "cull" of 1,662 geese from Denver parks, may have significantly altered population estimates.

173.    The 2020 EA includes multiple figures (Figures 3.25, 3.26, and 3.27) that do not accurately depict population numbers and abundance trends because they do not include Colorado Canada geese populations.

174.    Wildlife Services Colorado cannot use unverified personal communications and unsupported and outdated statistics to support management actions.

175.    According to the 2020 EA, Wildlife Services take of resident Canada geese will not exceed 10% of the total population in Colorado and will not exceed 1% of migratory populations of Canada geese wintering in Colorado.

176.    Wildlife Services has no way of knowing whether the take will exceed 10% of the total population in Colorado or whether it will exceed 1% of migratory populations of Canada geese wintering in Colorado because the agency does not have any reliable or scientifically supported population numbers of either nesting or wintering Canada geese in Colorado.

177.    Future management decisions concerning Canada geese depend upon current information in order to make informed decisions and accurately measure and analyze the success or failure of past management actions.

178.    Current information is particularly important here because the 2019 roundup and removal of geese far exceeded any previous Canada geese removal management actions.

179.    The 2020 EA does not take a hard look at the impacts of its proposed actions following the largest roundup and removal ever conducted of Canada geese in Denver parks in 2019.

180.    Analysis of environmental impacts should take into account yearly variations and migratory movements of the impacted species.

181.    In 2019, before the 2020 EA was prepared, Wildlife Service Colorado removed a total of 1,662 geese from four Denver Parks alone.

182.    In the previous 5 years (through 2017), Wildlife Services Colorado removed only an average of 314 birds and 5 nests per year throughout Colorado.

183.    According to the responses to public comments in the 2020 EA, the significant increase in the number of Canada geese rounded up, removed, and killed in

Colorado did not merit any further impact analysis in the EA because it was "outside the timeframe of analysis."

> 2.     **The Agencies Failed to Adequately Consider the Impact of Donating the Carcasses as Food for the Needy.**

184.    Canada geese rounded up, removed, and slaughtered pursuant to the proposed action will be donated to needy families without inspection despite the likely presence of contaminants in the meat.

185.    According to the 2020 EA, "[s]tudies examining the effects of chronic low-dose exposure to contaminants among human populations remain controversial due to inconsistent findings among studies."

186.    Although commercially produced meats are often subject to screening for contaminants, no public health entity routinely monitors contaminants in wildlife game.

187.    DPR uses numerous biocides in Denver parks, including, among many others, the herbicide Glyphosate (brand name, Roundup), applied to turf areas, and the algaecide Cutrine Plus (copper), applied to lakes.

188.    Many of the biocides used in Denver parks have been shown to be highly toxic and/or carcinogenic to both animals and humans.

189.    Canada geese consume grass, water, and other vegetation that have likely received biocide treatments in Denver parks.

190.    Without any testing or inspection, it is unclear whether donated wild geese meat contains any residual biocides or is otherwise contaminated.

191.    A high probability of contaminated meat exists because the birds may have been exposed to pollutants and pesticides in the urban park areas.

192.    According to the packaged Canada geese meat distributed for human consumption following the 2019 roundup, the geese meat is a "CDPHE Approved Source for Donation." Some, but not all, of the packaged goose meat also contains the following

statement: "Because they may be exposed to environmental contaminants, the Colorado Department of Public Health and Environment recommends that you eat no more than two meals per month of all wild waterfowl, including these wild geese. Previous testing of wild goose meat indicates that chemical contaminants should not be a human health concern. However, there is a possibility that the meat could contain bird shot that may contain lead. To avoid cracked or chipped teeth or swallowing bird shot, inspect the meat and remove any shot before cooking. Be cautious for shot as you eat."

193.    Citing only to a single 2014 study conducted in 2006 and 2007 on Canada geese samples taken from the east coast, the 2020 EA states that APHIS Wildlife Services examined 17 contaminants of concern (COC) in breast meat of wild Canada geese, including arsenic, cadmium, calcium, cobalt, copper, iron, lead, magnesium, manganese, mercury, molybdenum, selenium, thallium, zinc, organic chemicals, dichlorodiphenyldichloroethylene, and polychlorinated biphenyls (PCBs). The 2014 study did not examine any resident or nesting geese taken from Colorado and did not examine the effects of exposure of the biocides used in Denver's parks.

194.    Based on the 2014 study, the 2020 EA concludes that the "average concentrations of COCs in Canada goose meat were similar to those reported from commercially raised poultry." The 2020 EA does not cite to any other studies concerning human consumption of donated wild goose meat.

195.    According to the 2020 EA, "[w]hen waterfowl, such as Canada geese, are live-captured by [Wildlife Services] and processed by state health department approved businesses, the state health department evaluates and issues statements regarding the acceptability of the meat for human consumption."

//

//

//

**CLAIMS FOR RELIEF**

**FIRST CLAIM**

**(National Environmental Policy Act)**

196.     Plaintiffs herein incorporates all information and allegations contained in the preceding paragraphs.

197.     The 2020 EA fails to take a hard look at the impacts of its proposed actions following the largest roundup and removal ever conducted of Canada geese in Denver parks in 2019. There is no discussion how the 2019 and 2020 roundups might cumulatively impact the Canada geese population.

198.     The 2020 EA fails to rely on updated and scientifically supported data on Canada geese populations in Colorado, including updated population numbers and the current condition of Denver parks and other areas of Colorado where lethal take of Canada geese may take place.

199.     The 2020 EA relies solely on estimates from 2013 to 2017 to inform its analyses.

200.     The 2020 EA further fails to adequately respond to public comments concerning discrepancies in analyses contained in the 2020 EA concerning Canada geese.

201.     By failing to rely on updated and scientifically supported data, the actions authorized in the 2020 EA are based on incomplete and uninformed information.

202.     The 2020 EA fails to fully analyze the risks associated with donating Canada geese rounded up and removed from Denver parks treated with dangerous biocides to needy families in Colorado.

203.     Studies examining the effects of exposure to contaminants among human populations remain controversial due to inconsistent findings among studies, and therefore uncertainty exists concerning the safety of donating wild Canada geese meat.

204.    Accordingly, Wildlife Services actions are arbitrary and capricious, an abuse

of discretion, and not in accordance with law or required procedure, and should be set

aside under the Administrative Procedure Act, 5 U.S.C. § 706.

## SECOND CLAIM

## (Migratory Bird Treaty Act)

205.    Plaintiffs herein incorporates all information and allegations contained in the

preceding paragraphs.

206.    FWS has statutory authority and responsibility for enforcing the MBTA and

issues permits for otherwise prohibited activities under the Act, including Federal

migratory bird depredation permits.

207.    FWS's decision to issue the 2020 Goose Kill Permit authorizing the lethal take

of 4,000 Canada geese without any reasonable evidence that the actions proposed in the

2020 EA are necessary is contrary to the authority granted to FWS under the MBTA.

208.    Accordingly, FWS's actions were arbitrary and capricious, an abuse of

discretion, and not in accordance with law or required procedure, and should be set aside

under the Administrative Procedure Act, 5 U.S.C. § 706.

## REQUEST FOR RELIEF

Plaintiffs respectfully requests that the Court enter judgment providing the following relief:

A.  Declare that APHIS Wildlife Services violated the National Environmental Policy Act
    and its implementing regulations and acted arbitrarily and capriciously by failing to
    adequately analyze the impacts of it actions following the largest Canada geese
    roundup and removal action ever conducted in Colorado in 2019;

B.  Declare that APHIS Wildlife Services violated the National Environmental Policy Act
    and its implementing regulations and acted arbitrarily and capriciously by failing to
    rely on updated and scientifically supported data;

C.  Declare that APHIS Wildlife Services violated the National Environmental Policy Act
    and its implementing regulations and acted arbitrarily and capriciously by failing to
    fully analyze the risks associated with donating Canada geese rounded up and

removed from Denver parks treated with dangerous biocides to needy families in Colorado.

D. Declare that FWS violated the Migratory Bird Treaty Act and its implementing regulations and acted arbitrarily and capriciously by issuing the 2020 Goose Kill Permit for the lethal take of 4,000 Canada geese;

E. Enjoin APHIS Wildlife Services from taking any further action to remove live geese from Denver parks or open spaces until APHIS Wildlife Services has complied with the National Environmental Policy Act;

F. Enjoin APHIS Wildlife Services from taking any further action in donating geese killed pursuant to the 2020 Decision and 2020 Goose Kill Permit for processing and distribution for human consumption until APHIS Wildlife Services has complied with the National Environmental Policy Act;

G. Vacate and remand the 2020 Decision back to APHIS Wildlife Services;

H. Vacate the 2020 Goose Kill Permit;

I. Award Plaintiff reasonable costs, litigation expenses, and attorney fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. §§ 2412 et seq., and/or all other applicable authorities; and/or

J. Grant Plaintiff any other relief that the Court deems just and proper.

Dated: June, 5, 2020                    Respectfully submitted,

                                        s/ Courtney R. McVean
                                        Courtney Renee McVean (CO Bar # 48358)
                                        courtney.mcvean@friendsofanimals.org

                                        s/ Michael R. Harris
                                        Michael Ray Harris (CO Bar # 35395)
                                        michaelharris@friendsofanimals.org

                                        Friends of Animals, Wildlife Law Program
                                        7500 E. Arapahoe Rd., Suite 385
                                        Centennial, CO 80112
                                        720-949-7791

                                        *Attorneys for Plaintiffs*