**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Civil Action No. 20-cv-01625-RM

CANADA GEESE PROTECTION COLORADO, LLC, and
FRIENDS OF ANIMALS,

      Plaintiffs,

v.

MARTIN LOWNEY, in his official capacity as Colorado State Director for the United States
Department of Agriculture, Animal and Plant Health Inspection Service, Wildlife Services,
ANIMAL AND PLANT HEALTH INSPECTION SERVICE, WILDLIFE SERVICES, an
agency of the United State Department of Agriculture, and
UNITED STATES FISH AND WILDLIFE SERVICE, an agency of the United States
Department of the Interior,

      Defendants.

---

**ORDER**

---

      Plaintiffs filed this action seeking a declaration that Defendants have violated the

National Environmental Policy Act ("NEPA") and the Migratory Bird Treaty Act ("MBTA") and

to enjoin Defendant Animal and Plant Health Inspection Service, Wildlife Services ("Wildlife

Services") from taking action authorized under a 2020 Depredation Permit issued by Defendant

United States Fish and Wildlife Service ("FWS"). Plaintiffs bring two claims for relief, one

under NEPA and one under the MBTA. At issue is Plaintiffs' Motion for Preliminary Injunction

(ECF No. 4), seeking to enjoin the culling of 4,000 resident Canada geese which was scheduled

to begin as soon as July 1, 2020. The Motion is now fully briefed; the Court finds that no hearing

is necessary in order to resolve the Motion.[1] Upon consideration of the Motion and the court

record, and being otherwise fully advised, the Court finds and orders as follows.

## I.      STATUTORY BACKGROUND

### A.  NEPA

NEPA represents a "'broad national commitment to protecting and promoting

environmental quality.'" *Cure Land, LLC v. U.S.D.A.*, 833 F.3d 1223, 1229 (10th Cir. 2016)

(quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989)). Thus, NEPA

"'imposes <u>procedural</u> requirements [on agencies] intended to improve environmental impact

information available to agencies and the public.'" *Cure Land, LLC*, 833 F.3d at 1229

(underscore in original) (quoting *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565

F.3d 683, 704 (10th Cir. 2009)). NEPA does not, however, "'require agencies to reach particular

substantive environmental results.'" *Cure Land, LLC*, 833 F.3d at 1229 (quoting *Los Alamos*

*Study Grp. v. U.S. Dep't of Energy*, 692 F.3d 1057, 1060 (10th Cir. 2012)).

To comply with NEPA, agencies are required to take "a hard look at the environmental

consequences before taking a major action." *Cure Land, LLC*, 833 F.3d at 1229 (citation and

quotation omitted). Thus, first, NEPA "places upon an agency the obligation to consider every

significant aspect of the environmental impact of a proposed action." *WildEarth Guardians v.*

*U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 690 (10th Cir. 2015). Then, second, NEPA "ensures

---

[1] Rule 65(a) of the Federal Rules of Civil Procedure does not expressly require an evidentiary hearing before a court rules on a motion for a preliminary injunction. *Northglenn Gunther Toody's, LLC v. HQ8-10410-10450 Melody Lane LLC*, 702 F. App'x 702, 705 (10th Cir. 2017) ("[N]either Fed. R. Civ. P. 65(a) nor this circuit's precedent require the district court to hold an evidentiary hearing or oral argument before deciding a motion for a preliminary injunction.") Instead, a court may deny an injunction based on the written evidence without a hearing, even if one is requested, where "receiving further evidence would be manifestly pointless." 11A Charles Alan Wright et al., Federal Practice and Procedure § 2949 (3d ed. 2020). *See also Carbajal v. Warner*, 561 F. App'x 759, 764 (10th Cir. 2014) (district court within discretion to decide whether to hold an evidentiary hearing); *Reynolds & Reynolds Co. v. Eaves*, 149 F.3d 1191, 1998 WL 339465, at *3 (10th Cir. June 10, 1998) (table) (same).

that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *U.S. Fish & Wildlife Serv.*, 784 F.3d at 690.

Under NEPA, where it is unclear whether a proposed action's environmental effects will significantly affect the quality of the human environment, an agency may prepare an environmental assessment or "EA." *Cure Land, LLC*, 833 F.3d at 1230; 40 C.F.R. § 1501.4(b). "If the EA leads the agency to conclude that the proposed action will not significantly affect the environment, the agency may issue a finding of no significant impact [FONSI] and proceed with the federal action without further ado." *Cure Land, LLC*, 833 F.3d at 1230 (citation and quotation omitted); 40 C.F.R. § 1501.4(c) & (e). A FONSI is "a document by a Federal agency briefly presenting the reasons why an action…will not have a significant effect on the human environment and for which an environmental impact statement [EIS] therefore will not be prepared."[2] 40 C.F.R. § 1508.13.

### B. MBTA

"The MBTA … [is one] of our nation's oldest conservation statutes. Congress enacted th[is] statute[] against the background of the Migratory Bird Treaties," also called conventions.[3] *United States v. Hardman*, 297 F.3d 1116, 1121 (10th Cir. 2002). "The purpose of the conventions, and of the Act, is the protection of migratory birds." *United States v. Richards*, 583 F.2d 491, 495 (10th Cir. 1978). Under the MBTA, unless permitted by valid regulations, as relevant here, it is "unlawful at any time, by any means or in any manner, to pursue, hunt, take,

---

[2] An environmental assessment, in essence, is "a rough-cut, low-budget [EIS] designed to show whether a full-fledged [EIS]—which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project—is necessary." *U.S. Fish & Wildlife Serv.*, 784 F.3d at 690 (brackets in original) (citation and quotation omitted).

[3] These treaties, or conventions, are with Great Britain (on behalf of Canada), Mexico, Japan, and the former Soviet Union. *United States v. Hardman*, 297 F.3d 1116, 1121 (10th Cir. 2002).

capture, kill, attempt to take, capture, or kill … any migratory bird, any part, nest, or egg of any such bird … included in the terms of the conventions." 16 U.S.C. § 703(a). Canada goose (*Branta canadensis*) is covered under MBTA. *See* 50 C.F.R. § 10.13(c)(1). And, under the regulations, before Canada geese may be taken or killed, a depredation permit is required. *See* 50 C.F.R. § 21.41(a) & (c). Such permits are limited to one year. 50 C.F.R. § 21.41(d). In this case, permits are issued by the FWS. *See* ECF No. 4-1 (2020 Permit).

## II.     FACTUAL AND PROCEDURAL BACKGROUND

As stated, Canada geese are federally protected under the MBTA.[4] Therefore, as relevant here, it is illegal to possess, transport, or kill Canada geese in Colorado without obtaining a permit from FWS. Plaintiffs are the Friends of Animals and Canada Goose Protection Colorado, LLC, animal advocacy organizations; they filed this action on their own behalf and on behalf of members who are allegedly adversely affected by Wildlife Services' contemplated action in culling[5] resident (i.e., non-migratory) Canada geese pursuant to a permit, where some of the goose meat will be donated to Colorado charities. Plaintiffs seek to enjoin Wildlife Services "from any and all lethal [take of ] Canada geese pursuant to the 2020 [] Permit"[6] until final judgment on the merits of Plaintiffs' claims. The events which precede this Motion unfolded as follows.

On April 9, 2020, FWS's Migratory Bird Permit Office issued a depredation permit

---

[4] This case involves resident (non-migratory) geese but the parties do not dispute that the MBTA's protection extends to certain resident bird species covered, including resident Canada geese. (ECF No. 14, p. 1 n.2.)
  Unless otherwise stated, the page references in this Order are to the page numbers as set forth in the document (usually found at the bottom of the page), rather than to the page number assigned to the document by the court's ECF system (found at the upper right hand corner of the header of the document).
[5] As used by the parties, "culling" refers to the round-up and live capture of resident Canada geese, which are then transported to a third-party processor for humane euthanization. (ECF No. 14, p. 1 n.1.) Plaintiffs apparently take issue with whether it is humane, but that is irrelevant in light of the Court's decision here.
[6] ECF No. 4, p. 23.

("2020 Permit") pursuant to the MBTA, authorizing Wildlife Services to cull up to 4,000 resident Canada geese across the state of Colorado in 2020. FWS issued the 2020 Permit based in part on the analyses by Wildlife Services in a 2020 EA, and the resulting FONSI, for Bird Damage Management in Colorado.

The 2020 EA analyzed the impacts of Wildlife Services' bird management activities across the state of  Colorado for many species of birds from federal fiscal years 2013 to 2017. With respect to resident Canada geese, the EA used a statewide population estimate based on data supplied by Dr. Jim Gammonley, Colorado Parks and Wildlife's expert avian researcher.[7] That estimate is 44,000 geese. The EA analyzed direct and cumulative impacts of Wildlife Services' management activities on the statewide resident Canada geese population.[8]

The 2020 EA also analyzed potential risks of human consumption of wildlife resources, including the birds Wildlife Services manages in Colorado.[9] It specifically analyzed the consumption of donated Canada goose meat, including studying 17 contaminants of concern in breast meat of wild Canada geese. The EA also stated that all geese donated by Wildlife Services for human consumption "are lived captured, transported to a wild game or custom meat processor, and approved for donation by the Colorado Department of [Public] Health and Environment [CDPHE]. Additionally, the meat remains frozen after processing, contains proper instructions for safe-cooking, and [is] confirmed by the [CDPHE] that there are no known disease or illness concerns from this species of wild geese."[10] Further, the EA represented that "any approved CDPHE processors follow industry specific safeguards related to the processing

---

[7] Dr. Gammonley is referred to throughout the various documents.
[8] *See* EA at 323-333.
[9] *See* EA at 391-395, 400-402.
[10] EA at 401-402.

of meat intended for human consumption."[11]

The 2020 Permit allows Wildlife Services to lethally take 4,000 (less than 10% of the estimated 44,000) resident Canada geese in Colorado and donate them to charitable organizations. As allowed by the 2020 Permit, Wildlife Services plans to cull resident Canada geese and, according to Defendants, the optimal time to do so is between June 10-July 20. This is because most Canada geese are molting during this time period and, therefore, flightless.[12] Hence, Plaintiffs' Motion followed, with Defendants agreeing to delay any culls in the Denver parks until July 1, 2020.[13]

### III.   LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019) (quotation marks and citation omitted). To prevail on a request for preliminary injunctive relief, the moving party must establish (1) a substantial likelihood of success on the merits; (2) irreparable harm unless an injunction is issued; (3) the threatened injury to the moving party outweighs the harm that the injunction may cause the opposing parties; and (4) if issued, the injunction will not adversely affect the public interest. *Diné Citizens Against Ruining our Environment v. Jewell,* 839 F.3d 1276, 1281 (10th Cir. 2016) (quoting *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002)).[14]

---

[11] EA at 402.

[12] ECF No. 14-1, ¶ 19.

[13] By separate order, when briefing was completed, the Court advised the parties that it anticipated a decision on the Motion by July 6.

[14] Plaintiffs contend they seek to maintain the status quo; the Court questions whether they are in fact seeking a disfavored injunction – one in which they face a heavier burden. *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019) ("Disfavored preliminary injunctions don't merely preserve the parties' relative positions pending trial. … Instead, a disfavored injunction may exhibit any of three characteristics:

## IV.    DISCUSSION

### A.  AGENCY REVIEW

An agency's decision will not be set aside unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) & (D); *U.S. Fish & Wildlife Serv.*, 784 F.3d at 682. An agency's decision is arbitrary and capricious if the agency:

> (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment.

*WildEarth Guardians v. Conner*, 920 F.3d 1245, 1256 (10th Cir. 2019) (quotation marks and citation omitted).

A court's review under the APA must be thorough, but its review is nonetheless very deferential to the agency. *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1165 (10th Cir. 2012). The courts' "deference to the agency is more substantial when the challenged decision involves technical or scientific matters within the agency's area of expertise." *U.S. Fish & Wildlife Serv.*, 784 F.3d at 683 (citation and quotation omitted). There is a presumption of validity to the agency's action and the burden of proof rests with the party challenging such action. *Cure Land, LLC*, 833 F.3d at 1230. The courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs.*

---

(1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." (citations omitted).). Regardless, the Court will assume Plaintiffs do not and will apply the ordinary standard.

*Ass'n of U.S., Inc. v. State Fam Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation and quotation omitted).

### B.  PLAINTIFFS' CHALLENGES

As stated, to be granted the extraordinary relief which Plaintiffs seek, they must make four showings. The Court starts with the first – a substantial likelihood of success on the merits. To sustain this burden, Plaintiffs must show the challenged actions (or inactions) are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) & (D).

### 1.  <u>Substantial Likelihood of Success on the Merits</u>

### <u>First Claim – NEPA</u>

Plaintiffs' challenge under NEPA may be divided in two parts: (1) the method of analyzing potential environmental effects of Wildlife Services' resident Canada goose management activities in Colorado in the EA; and (2) the donation of Canada goose meat to charities to feed Colorado families. The Court examines each in turn.

### a)  Challenge to Methodology

### (1) Alleged Failure to Consider Impact of 2019 Goose Culls

In 2019, Wildlife Services also obtained a depredation permit authorizing the lethal take of resident Canada geese (the "2019 Permit"). And, based on this permit, Wildlife Services culled 1,662 Canada geese from four Denver parks. Plaintiffs argue the EA relies on data for the five-year period of 2013 to 2017, when the average take in Colorado was 314 Canada geese and 5 nests (0.714%), failing to take a hard look at how the 2019 culls (with its 1,662 lethal takes in four Denver parks alone) and 2020 culls might cumulatively impact Colorado's Canada goose

population. Instead, Plaintiffs assert, Wildlife Services summarily dismissed the 2019 culling without an explanation of why this information was not relevant to its impact analysis.

In response, Defendants assert Wildlife Services took a "hard look." Specifically, according to Defendants, Wildlife Services did conclude the 2019 cull was outside of the years referenced in the analysis (2013-2017) but nonetheless did discuss the 2019 culls in its "Cumulative Impacts" section of the "Canada geese" portion of its analysis.[15] In addition, Defendants contend that in the subsequently issued FONSI, Wildlife Services did discuss the 2019 cull and concluded it did not change its analysis. As for 2020 culls, Defendants assert it is also outside of the timeframe of Wildlife Services' analysis in the EA, but the information nonetheless shows the cumulative impact will not exceed the yearly take of 10% of the total statewide population as contemplated under the EA. The Court agrees.

As an initial matter, Plaintiffs do not argue or show that Wildlife Services' reliance on the 2013-2017 was arbitrary or capricious or contrary to law. Instead, Plaintiffs argue Wildlife Services should have considered more – the additional data from the 2019 Permit and the 2020 culls from the 2020 Permit. But, as Defendants argue, Wildlife Services did do so as to the 2019 culls. While Wildlife Services found the 2019 data inapplicable because it was outside of the timeframe analyzed in the EA, when questioned, it did consider the data and found it was "consistent with the conclusions and material presented in the Pre-decisional draft of the EA and did not change the analysis."[16] And, the analysis in the EA supports this conclusion: using the estimate of 44,000 resident Canada geese, a total cull of 2,094 in 2019 was within the 10% take limitation set forth in the EA.

---

[15] EA at 333 & n.11.
[16] ECF No 14-4, FONSI at 8.

As for the 2020 Permit, that was not issued until April 2020, after the EA and FONSI were issued in January 2020. Thus, those documents could not have discussed the impact of the 2020 Permit. Nonetheless, as Defendants contend, the evidence shows the cumulative impact of the 2019 actual take and 2020 maximum take is also within the 10% take limitation set forth in the EA, assuming 44,000 resident Canada geese. Specifically, at the end of 2019, the amount of resident Canada geese would have been 41,906 (44,000 – 2,094).[17] And, if 4,000 resident Canada geese were culled statewide, this would still be within the 10% take limitation (41,906 x .10 = 4,190.6). Plaintiffs assert this misses the point because it is the total environmental impact of the proposed action which is at issue. But, as the Court understands Defendants' position and the EA's analysis, Wildlife Services determined that where the authorized take is within 10% of the total population of resident Canada geese, the proposed action would not have an adverse environmental impact. While Wildlife Services could have provided more analysis in its EA, it is not for the court to "ask whether [the analysis] could have discussed environmental impacts in more detail." *Conner*, 920 F.3d at 1257.

### (2) Alleged Inaccurate Statewide Population Estimates

Plaintiffs argue Wildlife Services' actions are "uninformed" because it did not conduct "necessary surveys" to determine resident Canada geese population. Instead, Plaintiffs assert, Wildlife Services relied on "outdated population estimates," surveys which did not include Colorado geese, and population estimates that cite to personal communications or which contain no citation at all (i.e., data which they assert is unverified and unsupported). In response, Defendants counter that Plaintiffs fail to show there is any requirement that Wildlife Services

---

[17] Assuming no increase.

conduct any surveys on resident Canada geese or that the FWS requires such surveys prior to issuing a permit to cull them; the surveys which did not include Colorado geese (EA at 324-326), were used to assess migratory geese, not resident (non-migratory) geese; and the 44,000 conservative estimate of Canada geese was based on data from Dr. Gammonley. In reply, Plaintiffs contend Wildlife Services cannot rely on an "assumed" estimate of 44,000 resident Canada geese, that number is nowhere to be found in the cited 2019 Colorado Resident Canada Goose Management Plan by Dr. Gammonley (the "2019 Plan"), and that without an accurate count the agency cannot know whether any authorized take would exceed 10%. The Court examines these arguments below.

First, Plaintiffs have not shown that Wildlife Services was required to conduct any population surveys, or that FWS required them. Next, Wildlife Services made certain assumptions, but Defendants direct the Court to the record to show such assumptions are based on estimated data provided in the 2019 Plan. While Dr. Gammonley cautioned it was a crude index to the true population, the 2019 Plan "used results from an intensive statewide banding program to provide a benchmark of approximately 17,400-26,1000 resident Canada goose statewide following the breeding season during the 2000s."[18] And, that, while imprecise, Dr. Gammonley stated data from the North American Breeding Bird Survey (BBS) indicated an increasing trend (7.21% average annual increase, 0.17-15.19% credible interval) in the breeding population.[19] By the Court's calculation, using 17,400 as a baseline starting in 2006,[20] a 7.21% average annual increase in population would yield more than 43,000 Canada geese by 2018. This

---

[18] ECF No. 14-7, p. 2.
[19] ECF No. 14-7, p. 3.
[20] EA at 331

is in line with the 44,000 number of Canada geese by 2018 as shown on Figure 3.28 in the EA and with the communication Wildlife Services received from Dr. Gammonley.[21] Absent a sufficient showing by Plaintiffs to the contrary, the Court finds it should defer to the agency's expertise and discretion in deciding which data to utilize in its decisionmaking. *See Conner*, 920 F.3d at 1257.

As to surveys which did not include Colorado geese, Plaintiffs do not dispute those surveys were used to assess migratory geese, not resident (non-migratory) geese, and are therefore irrelevant to the issues at hand. Finally, as to citations in the EA to personal communications or which contain no citation at all, Plaintiffs fail to show that Wildlife Services may not rely on, and cite to, personal communications or how the lack of any citation rendered what they contend are at issue arbitrary and capricious. The EA at 329 and 331, which Plaintiffs cite, in fact contain citations and Defendants have pointed to parts of the 2019 Plan which supports the data at issue – the 44,000 Canada geese. In sum, on this record, Plaintiffs fail to meet their burden here of showing a substantial likelihood of success on this challenge.

### (3) Alleged Outdated Materials Referenced in the EA

Plaintiffs' last methodology challenge is to the alleged "outdated scientific studies and other evidence"[22] relied on in the EA in its analysis. Here, Plaintiffs contend the EA cited to 20 entries, of which only one quarter of the references were published in the past five years, thereby failing to consider the best available scientific evidence. Defendants respond that Plaintiffs fail to point to any recent study or other evidence which was omitted from consideration. The Court

---

[21] EA at 328, 331.
[22] ECF No. 4, p. 13.

agrees. Accordingly, this argument also fails to show Defendants' actions were arbitrary or capricious or contrary to law.

### b)  Challenge to Donating Goose Meat

In 2019, some of the resident Canada goose meat was processed and donated to charitable organizations for human consumption. Wildlife Services will likely do the same this year. Plaintiffs raise a number of arguments, contending Wildlife Services failed to fully analyze the risks associated with donating Canada geese meat. According to Plaintiffs, some of the Canada geese from Denver parks "could potentially be contaminated"[23] because Denver parks are treated with pesticides and chemicals. Wildlife Services, however, obtained a variance from the Colorado Retail Food Establishment Rules and Regulations to allow the meat to be donated. But, Plaintiffs assert, the EA provides no indication the meat will be analyzed or treated but a thorough analysis of the risks associated with consuming the meat is required because of this potential contamination. Further, Plaintiffs argue, it is uncertain whether the geese are being "humanely euthanized" and processed in an approved facility as Wildlife Services suggests in its Annual Report. Defendants' response is two-fold: Plaintiffs lack standing and, even if they have standing, their challenge fails on the merits. The Court starts with standing. *See Rural Water Sewer & Solid Waste Mgmt., Dist. No. 1, Logan Cty., Oklahoma v. City of Guthrie,* 654 F.3d 1058, 1068–69 (10th Cir. 2011) (ordinarily, court must resolve jurisdictional issues such as standing before addressing the merits of the claim).

Defendants contend Plaintiffs lack standing to challenge the donation of goose meat because they are animal advocacy organizations and do not allege their members are families in

---

[23] ECF No. 4, p. 14.

need who might receive and consume donated goose meat, i.e., that they will suffer actual or imminent injury. In addition, Defendants argue Plaintiffs lack organizational standing because the interests they seek to protect here (the safety of goose meat consumption) is not germane to their organizations' purpose – animal welfare and culling of Canada geese. In response, Plaintiffs rely predominately on *WildEarth Guardians v. U.S. BLM*, 870 F.3d 1222 (10th Cir. 2017). The Court is not persuaded.

In *WildEarth Guardian*, WildEarth Guardians and the Sierra Club, environmental organizations, challenged the Bureau of Land Management's ("BLM") decision to approve four coal leases in Wyoming's Powder River Basin, where the coal tracts are near and partially within the Thunder Basin National Grassland, a national forest. Plaintiffs argued the BLM failed to comply with NEPA when it concluded that issuing the leases (alternative two) would not result in higher national carbon dioxide emissions than would declining to issue them (no action alternative); that the BLM failed to adequately compare the alternatives it considered.[24] In addressing a challenge to whether the *WildEarth* plaintiffs had Article III standing to sue, the Tenth Circuit stated:

> The Plaintiffs must show that their individual members have standing; that is, that they (1) have suffered or will imminently suffer a concrete and particularized injury that is (2) fairly traceable to the challenged agency action, and (3) likely to be redressed by a favorable decision. … Next, the Plaintiffs must demonstrate that the "interests at stake are germane to the organization's purpose" and that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." … *Article III standing must be established for each form of relief sought*….

*WildEarth*, 870 F.3d at 1230 (emphasis added). The Tenth Circuit found the *WildEarth* plaintiffs had standing because they proved every element.

---

[24] The BLM was required to consider alternatives to the proposed action. *WildEarth Guardian*, 870 F.3d at 1226.

Specifically, first, the environmental impacts of the leases were germane to the purposes of both plaintiffs. Second, plaintiffs established an injury in fact because their individual members would suffer harm to their personal aesthetic and recreational interests in the Thunder Basin National Grasslands, which would be adversely affected by the mining leases. The increased in environmental harm was directly tied to BLM's inadequate alternatives comparison. Third, plaintiffs' injuries would be redressed through the vacatur of the BLM's FEIS, RODs,[25] and resulting leases. As to the challenge to the causation element, the Tenth Circuit stated the plaintiffs' injury need not be tied to the deficiency alleged in the FEIS; instead, the court should focus on the form of relief. And, there, the vacatur of the BLM's decisions would redress plaintiffs' environmental injuries. Such is not the case here.

First, the impacts of Wildlife Services' bird damage management methods on public safety at issue – the alleged contamination of goose meat – are not germane to Plaintiffs' organizational purposes. Next, while Plaintiffs have sufficiently shown an injury in fact, it is not "fairly traceable to the challenged agency action." *WildEarth*, 870 F.3d at 1230. Here, the challenge at issue is Wildlife Services' alleged failure to fully analyze the risks associated with donating Canada geese meat, but the injury claimed is to Plaintiffs' "recreational, professional, and aesthetic interests in the geese themselves as well as the parks they reside in," as well as distress caused by the knowledge of harm to the geese.[26] As to redressability, even if the Court were to remand with instructions to Wildlife Services to take a "hard look" at the consumption of donated goose meat, that would not redress Plaintiffs' members asserted injuries. Accordingly, the Court finds Plaintiffs lack standing to seek relief based on Wildlife Services' alleged failure

---

[25] Final environmental impact statement (FEIS) and records of decision (RODs).
[26] ECF No. 4, p. 17.

to fully analyze the risks associated with donating Canada geese meat. In light of this determination, the Court need not reach the merits of Plaintiffs' goose meat challenge.

**Second Claim – MTBA.**

Here, Plaintiffs raise three challenges to the issuance of the 2020 Permit. The Court addresses them in turn.

First, Plaintiffs contend that because most of the lethal take under the 2019 Permit occurred in four Denver Parks, this "suggests" the 2020 Permit for up to 4,000 geese could result in the lethal take of significantly more than 10% of *Denver's* Canada goose population. This would then bring *Denver's* Canada geese population below the sustainable level. But, as Defendants argue, Plaintiffs fail to show that FWS must maintain sustainable levels of birds in the city of *Denver*. Instead, FWS analyzes resident Canada geese at a *statewide* level; the 2020 Permit provides for culls up to 4,000 geese *statewide*; and even with this culling, it would result in an overall statewide population far higher than FWS's 12,500 *statewide* population objective.[27]  In addition, Denver states that it intends to ask Wildlife Services to cull approximately 325-400 geese from six Denver parks,[28] dispelling Plaintiffs' concerns that most of the 4,000 geese will be culled from Denver parks. *See Conner*, 920 F.3d at 1261 (court presumes government agencies comply with law and  complies with what it proposes to do).

Next, Plaintiffs contend FWS failed to consider evidence that lethal take may not be necessary because there are far fewer geese in Denver parks in 2020, "likely due to new

---

[27] ECF No. 14-3, ¶¶ 4., 6-9; No. 14-5. Plaintiffs argue this objective is not in the EA. However, this is FWS's objective as set forth in its 2005 FWS FEIS. (ECF No. 14-3 (Olson Decl.), p. 3 at ¶ 6, p. 4; No. 14-3 (2005 FEIS), p. I-26.)
[28] ECF No 14-2, ¶ 22.

regulations allowing nest and egg destruction at any time of year."[29] First, as Defendants argue

and with which the Court agrees, Plaintiffs provide no scientific evidence in support of this

assertion. More importantly, Colorado's resident Canada geese population is managed on a

statewide level, not a park-specific or citywide level. And, further, Plaintiffs provide no evidence

to show the statewide trend relied upon by Defendants is improper in any way. Thus, this

argument also fails.

Finally, Plaintiffs argue that Canada geese are not damaging park property and are not a

threat to human health and safety. Instead, Plaintiffs assert, Wildlife Services is killing the geese

because they are a nuisance – they create unwanted feces – but a depredation permit may not be

issued for migratory birds which are merely causing a nuisance. Defendants rejoin that Plaintiffs

rely on paragraph G of the 2020 Permit which deals with emergency situations which prohibit

taking migratory birds which are "merely causing a nuisance," when paragraph D is at issue.

And, further, Defendants contend Plaintiffs mistakenly rely on 50 C.F.R. § 21.52(c),[30] when

FWS issued its permit under 50 C.F.R. § 21.41. The Court agrees.

A review of the 2020 Permit shows the authorization was given under paragraph D,

which allows the lethal taking "to relieve or prevent injurious situations impacting health or

safety, natural resources, agriculture (includes aquaculture), and public or private property."

And, the Permit Application Form shows that threats to health and safety and property are bases

for the requested culling. Further, FWS conducted a MBTA Biological Review and considered

relevant factors, including property damage and risk to public health and safety, before

---

[29] ECF No. 4, p. 16 (internal quotation marks omitted).
[30] Which covers public health control orders for resident Canada geese.

approving the permit.[31] Finally, a review of the 2020 Permit shows it was issued under 50 C.F.R. § 21.41. Accordingly, Plaintiffs fail to show the FWS's decision to issue the 2020 Permit was not in accordance with or contrary to the authority granted under the MBTA.

### 2.   <u>The Other Three Preliminary Injunction Factors</u>

Because Plaintiffs fail to establish a likelihood of success on the merits, the Court need not examine the remaining three factors. *Diné Citizens*, 839 F.3d at 1285 ("We therefore affirm on this ground [failure to show substantial likelihood of success on the merits] and do not address the parties' arguments regarding the other three prerequisites for preliminary relief."); *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d at 1136, 1141 (10th Cir. 2017) (recognizing that all four elements must be met with limited exception inapplicable here).

### V.   CONCLUSION

Based on the foregoing, it is **ORDERED** that the Motion for Preliminary Injunction (ECF No. 4) is **DENIED**.

DATED this 6th day of July, 2020.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge

---

[31] ECF No. 14-5; No. 14-3, pp. 2-5, 335-338.